**SO ORDERED.**

**SIGNED this 31 day of March, 2011.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **SAILBOAT PROPERTIES, LLC** | **10-03718-8-SWH** |
| **DEBTOR** | |

### ORDER REGARDING VALUATION OF PROPERTY

A hearing took place on December 1, 2010, in which the debtor's "dirt for debt" plan of reorganization was confirmed, subject to the court's further determination of the value of approximately 7 acres of real property in Bath, North Carolina (the "Property"). Based on the following analysis, the present value of the property to be surrendered under the debtor's plan is $2,250,000. As a result, Capital Bank holds a secured claim in the amount of $2,250,000 and an unsecured claim in the amount of $297,087.70.

### BACKGROUND

Sailboat Properties, LLC filed a petition for relief under chapter 11 of the Bankruptcy Code on May 7, 2010. Capital Bank holds a deed of trust on the Property, which is subdivided into eight waterfront residential lots in the Brookshire Estates subdivision in Bath, North Carolina. Prior to and following the filing of its petition, the debtor subdivided the Property, upgraded the main subdivision road to meet North Carolina Department of Transportation standards, performed grading

and site clean-up, took coring samples, applied a seal coat, repaved, and put in bulkheads on Lots 2 and 8, spending approximately $150,000 in completing these tasks. The project was completed in July 2010. No lots in the subdivision have been sold; however, all eight lots were recently listed for private sale and the debtor represented at the hearing that Lot 4 is under contract for a net sale price, prior to commissions, of approximately $415,000. The debtor further represented that the lots are listed for sale at the following prices: Lot 1 - $299,000; Lot 2 - $349,000; Lot 3 - $449,000; Lot 4 - $499,000; Lot 5 - $599,000; Lot 6 - $599,000; Lot 7 - $599,000; and Lot 8 - $529,000. The total retail sales price of all the lots is $3,922,000.

On May 14, 2010, Capital filed a proof of claim in the amount of $2,471,957, followed by an amended proof of claim on November 30, 2010 for $2,547,087. The parties have stipulated to the value set forth in the amended proof of claim. The debtor filed its plan of reorganization on August 4, 2010, followed by an amended plan on November 17, 2010, and a modification to the amended plan on November 30, 2010. Under the debtor's plan, Capital's claim will be satisfied through a dirt for debt exchange, in which the debtor will transfer all of the Property by deed to Capital in full satisfaction of the debt. The plan separately classifies the unsecured claim of Capital Bank, if any, and further provides that Capital will not receive any property or distribution for its unsecured claim but will rely on its ability to seek recovery from third parties to satisfy any such claim in whole or in part.

After an evidentiary hearing, the court confirmed the debtor's plan, finding, among other things, that the plan provides for Capital's realization of the "indubitable equivalent" of its secured claim pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii). Capital does not object to the treatment of its unsecured claim, but does dispute the debtor's appraised value of the Property. In light of the

disagreement as to the Property's value, the parties requested a determination of the value by the court, which would in turn determine the amount of Capital's unsecured claim, if any.

## DISCUSSION

The general rule with regard to dirt for debt plans is that "when a secured creditor receives *all* of the property to which its lien attaches, the creditor has received the full value – the "indubitable equivalent" – of its monetary claim . . . ." In re Bannerman Holdings, LLC, 2010 WL 4260003 at *3 (Bankr. E.D.N.C. 2010). For purposes of section 1129(b)(2), a secured creditor is only secured up to the value of the collateral; the difference between the collateral's value and the amount of the debt becomes an unsecured claim and is added to the pool of unsecured claims. In the Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1350 (5th Cir. 1989).

As this court noted in Bannerman, a conservative approach should be taken with regard to valuation, given the inherent uncertainties involved in the process. Id. at 8; see also In re Simons, 113 B.R. 942, 947-48 (Bankr. W.D. Tex. 1990) (finding a conservative approach appropriate because surrendering property to the lender shifts the burden of selling the property to the lender, the lender will not earn interest during the pendency of the sale, and the potential for error in the valuation process is significant).

In addition, his court and others have acknowledged the importance of case-by-case analyses when valuing property because of the various ways in which property can be disposed of or used, and the difficulty in determining the price such property would generate at a hypothetical sale, as well as the inherent vagaries in the valuation process. In re Peerman, 109 B.R. 718, 721 (Bankr. W.D. Tex. 1989); see also Bannerman, 2010 WL 4260003 at *8 (Bankr. E.D.N.C. 2010) ("All cases are fact specific, some more so than others.").

With these tenets of valuation in mind, section 506(a) applies to valuation of property for purposes of the "indubitable equivalent" standard, and that value must be ascertained as of the date of the plan confirmation. In the Matter of Atlanta S. Bus. Park, 173 B.R. 444, 449-50 (Bankr. N.D. Ga. 1994). Specifically, section 506(a) provides that the value "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a). The parties agree that the court's valuation of the collateral is determined as of the date of confirmation, but disagree as to what that value should be and whether entrepreneurial profit should be included in the equation.

### A.   The Highest and Best Use Test

Before reaching the specific issue of entrepreneurial profit, some discussion with regard to the application of section 506(a) is warranted. Although some courts have determined value based on what the property is worth in the hands of a particular holder (i.e., the secured creditor), this court will adopt the four-step "highest and best use" inquiry employed by the Peerman court. The court find this methodology more appropriate for determining the credit to be given against the debt in a dirt for debt plan involving the full surrender of collateral.[1] Peerman, 109 B.R. 718. Under this inquiry, the court first must ask: what is the highest and best use of the collateral? Second, what use of the collateral will yield the highest net value? Third, is the highest and best use of the

---

[1] The highest and best use of a property has been defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability." The Dictionary of Real Estate Appraisal 135 (The Appraisal Institute, 4th ed. 2002).

collateral the use that will yield the highest net value? And finally, is that use reasonably available to the secured creditor? Id. at 722.

Peerman involved the value of completely developed single-family residential lots as well as large undeveloped acreage tracts. As to the developed single-family residential lots, experts identified the current use as the highest and best use for the property. Further, the court concluded that the property's current use was also the use most likely to yield the highest net value, and determined that the use of a professional to market the sale of the property was reasonably available to the creditor as a means of disposing of the property. Id. As a result, the court assigned value to the property based on the sale of the developed residential lots to end users instead of using a liquidation value. Id. at 721-22. As to the property that consisted of large acreage tracts which had not been subdivided or improved, the experts concluded that the highest and best use would be to hold it for investment purposes for ultimate development into single family residential lots. Id. at 722. Although the court recognized that the creditor might prefer to sell the property immediately in order to convert the real property into cash, it determined that the role of the court in valuation was to use the method "most likely to yield the most value." Id. at 723 (quoting J. Queenan, Valuation of Security Interests, 92 Comm. L.J. 1923 (1987)). Therefore, the creditor must make the ultimate choice, at its own risk, between two reasonably available means of disposal. Id.

  **B. Entrepreneurial Profit**

Entrepreneurial profit "is an element of project costs because no one would build a project except with the expectation of profit. For appraisal purposes, it is a market-driven figure that reflects entrepreneurial expectation, and can take the form of profit on sale, additional return on investment, or use value to the entrepreneur." John Collen, Buying and Selling Real Estate in

5

Bankruptcy, Am. Bankr. Inst. 041504-ABI-CLE 969 at n.71 (quoting The Appraisal Institute, The Appraisal of Real Estate 317 (10th ed. 1992)).  Entrepreneurial profit is a variable element that is "hard to estimate because, among other reasons, it is hard to get reliable data on expectations," and is one of the "most uncertain" elements in appraisal methodology.  Collen, Buying and Selling at n.57 & p. 4.

In Bannerman, this court declined to include an "entrepreneurial profit," or "discount," or "incentive" in the valuation of real property to be transferred to the lender under a dirt for debt plan. Although entrepreneurial profit serves as an incentive to facilitate development of property from start to finish and as a reward for risk, the collateral involved in Bannerman consisted of fully completed condominium units.  No further development or construction was required to complete the project in preparation for sale.  In addition, testimony indicated that an entrepreneurial profit discount would only be appropriate if the units were sold together in a bulk sale to a developer. Moreover, the evidence suggested that the creditor would sell the units individually and that it had been working on a financing package toward this end.  Ultimately, this court concluded that a discount for entrepreneurial profit would be inappropriate in light of the completed state of the property, as well as the creditor's ability to market and offer financing on the property as single units.

The debtor contends that a discount for entrepreneurial profit should not be applied because Capital Bank, as the transferee, is not an entrepreneur, will not need to make any contribution to complete the project, and therefore assumes no entrepreneurial risk.  Capital counters that a developer's profit is a necessary component of market value because it accounts for the risk inherently associated with the collateral.  According to Capital, a buyer would require a discount to

6

compensate for such risk, as well as holding and related costs, and thus the market price must be adjusted in order to reflect actual market conditions.

Although Capital is required to accept property in lieu of cash under the debtor's plan, the valuation process is not dependent on the fact that the property will be owned by the secured creditor. Examining this case under the highest and best use analysis discussed in Peerman, the inclusion of entrepreneurial profit is inappropriate. The proposed dirt for debt exchange involves single-family residential waterfront lots in "as completed" condition. The court heard testimony from both the debtor's and Capital's appraisers,[2] as well as the debtor's principal, that the development of the Property appears to be primarily completed. Although Capital maintains that some construction is still needed to complete the lots, such as the inclusion of bulkheads on some of the lots, planting trees, maintaining erosion control, and making the Property compliant with the Division of Water Quality requirements, both appraisers considered the Property largely completed for purposes of their highest and best use analysis. Of some significance is the fact that Mr. Rasberry referred to the Property as a "fully developed" subdivision under his analysis of expenses associated with his appraisal. Rasberry Appraisal Report at 29. He further testified in court that although he included a discount for entrepreneurial profit in his written appraisal, he does not think it is appropriate because the project is complete.[3]

Relevant to a determination of the propriety of entrepreneurial profit is an assessment of the highest and best use of the property. Ultimately, both appraisers reported and testified that the

---

[2] Joseph C. Rasberry, III, appraised the Property for the debtor and R. Earl Jones appraised the Property for Capital Bank.

[3] Mr. Rasberry testified that he included an entrepreneurial profit discount in the appraisal because he assumed a bulk sale of the lots.

7

highest and best use of the Property at issue is the current use: single-family residential development. Rasberry Appraisal Report at 3; Jones Appraisal Report at 12. Given that the lots are largely completed, it appears that the sale of the already developed individual waterfront single-family residential lots will yield the highest net value. And, finally, selling the lots individually either through the use of a professional broker or through the preparation of financial packages for individual purchasers are procedures that are reasonably available to Capital.

Capital, like the secured creditor in Peerman, has at least two methods available to it for the disposition of the Property. Capital represents that it intends to liquidate the collateral at bulk sale, contending that it is not in the business of selling property and bulk sale of the collateral would allow it to more quickly realize cash payment of its secured claim. However, the fact that the Property will be owned by Capital does not alter the highest and best use of the Property. The goal of valuation is to determine the highest and best use of the property and, here, that is sale of the fully developed residential waterfront lots to end users. Because Capital is in a position to dispose of the Property in either of two ways, the ultimate choice and risk involved in that decision belongs to Capital.

Capital attempts to distinguish the facts of its case from Bannerman through its contentions that the lots involved are in an "as completed" state, and as such may produce expenses before the collateral can be sold. Specifically, Capital cites the inherent risks associated with "acquiring, holding, completing, maintaining, and improving the [c]ollateral, as well as paying taxes, assessments and entitlement compliance costs that Capital Bank must assume to realize a payment on its secured claim." Capital Bank Mem. at 4-5. Likewise, Capital contends that the market for sales of residential, waterfront lots in eastern North Carolina is depressed, there are environmental

8

concerns on the Property that inhibit the construction of improvements, and more construction may be necessary to prepare the collateral for sale. However, this case is analogous to <u>Bannerman</u> in that no further development or construction is required to complete the Property in order to prepare it for sale. Although both appraisers included entrepreneurial profit, Mr. Rasberry testified that it should not be included because the Property is completed. Mr. Jones described developer's profit in his appraisal report as the rate at which a "developer, builder, or investor, for undertaking a project of this nature or acquiring multiple lots for speculation purposes, is entitled to a return for his entrepreneurial ability and/or risk." Jones Appraisal Report at 23. In this case, even under Mr. Jones' standard, it would be inappropriate to include an entrepreneurial profit because the highest and best use of the Property, as well as the highest valued use, is to sell the lots to the ultimate transferees, individual purchasers, who do not qualify as developers, builders or investors.[4]

Instead of including entrepreneurial profit, Capital's risk level can be accounted for with the proper discount rate. Both appraisers calculated the present value of the Property based on a four year sell out period, giving Capital an adequate cushion for the time it will likely take to convert the Property into its cash equivalent. Also, the appraisers included administrative rates and marketing rates to cover the holding, maintenance, and sale-related expenses associated with the Property. Therefore, the inclusion of an entrepreneurial profit discount in determining the value of the Property on top of these deductions would be duplicative and inappropriate.

---

[4] In contrast, the debtor agrees that it is proper to deduct entrepreneurial profit when the assumption is made that the ultimate transferee is a wholesale buyer. Debtor's Mem. at 5.

### C. The Value of the Property

The appraiser for the debtor, Mr. Rasberry, determined the fair market value of the Property at $2,100,000 as of November 19, 2010. In using the Sales Comparison Approach and Income Approach, Mr. Rasberry considered an absorption rate of two lots per year for a total sell out of the eight lots in four years. He also included a discount rate of 12% per year, an entrepreneurial profit discount of 10%, and projected administration and marketing costs at 3% and 6%, respectively. The per unit value assigned was $411,000. Mr. Rasberry testified that he included entrepreneurial profit in the appraisal because he assumed a bulk sale of the Property; however, as previously discussed, because the development was completed, entrepreneurial profit should not be included.

Mr. Rasberry's reported highest and best use of the Property was the existing use as single-family residential lots within a subdivision. Prior to trial, Mr. Rasberry prepared exhibits to update his written appraisal, which employed an original unit price of $427,000 based in part upon the pending contract on Lot 4, and which removed the entrepreneurial profit discount. Exhibit 9. The value derived from those updated calculations was approximately $2,450,000.

Capital's appraiser, Mr. Jones, used a different procedure to derive the retail value of the Property. He used an absorption rate of two lots per year for a total sell out in four years, and included a 10% discount rate, a 15% entrepreneurial profit discount, a 7% commission rate and 3% administration/overhead cost rate. Mr. Jones' appraisal fixed the wholesale value to one buyer at $1,144,000 as of September 21, 2010. He, like Mr. Rasberry, also concluded that the highest and best use of the Property is the existing single-family residential subdivision.

The court has the task of determining the value of the Property, faced with two conflicting appraisal reports. "When two appraisal reports conflict, a court 'must determine the value based on

the credibility of the appraisers, the logic of their analys[es] and the persuasiveness of their subjective reasoning.'" In re Atlanta S. Bus. Park, Ltd, 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) (corrected in order to conform to original), citing In re Park Ave. Partners, 95 B.R. 605, 610 (Bankr. E.D. Wis. 1988). The court finds that both appraisers were credible and adopts portions of each appraiser's analysis to arrive at an ultimate valuation determination.

First, it is helpful to set out where the appraisers agree. Both appraisers make the following identical assumptions: (1) the highest and best use of the Property is as a residential subdivision, as presently developed; (2) the approximate absorption rate is two lots per year with a total sell out in 4 years; and (3) administrative expenses are 3%. There remains, therefore, the following items of disagreement: (1) the proper discount rate; (2) the proper marketing rate, and (3) the approximate retail lot price. The appraisers both included an entrepreneurial profit discount in their respective appraisals, which the court has already determined should be omitted.

Capital Bank's appraiser, Mr. Jones, employed a 10% discount rate in his analysis. It appears that he arrived at that rate by determining that a combined deduction for the discount rate and developers profits should be 25% and allocated 15% to developer's profit, leaving a 10% discount rate. Jones Appraisal Report at 23-24. Mr. Rasberry chose a 12% discount rate to convert the anticipated cash flows into present value, using published indicators. Rasberry Appraisal Report at 29-30. The basis for Mr. Rasberry's choice of a 12% discount rate is more readily ascertainable and results in a lower valuation in accord with the court's charge to take a conservative approach to valuation.

Mr. Jones employs a 7% marketing cost while Mr. Rasberry employs a 6% marketing cost in the analysis. Neither appraiser provides any additional support for their rates in their reports or

11

testimony. The debtor bears the burden on valuation so the court will accept the 7% rate. Such a choice will also produce the more conservative valuation by increasing the costs of sale.

Although the marketing costs and discount rate deductions do have a significant effect on the valuations, the most substantial differential is found in the retail lot price estimates. Mr. Rasberry uses a $411,000 unit value for the first two years and then escalates that value 5% for each year thereafter, resulting in a unit value of $431,550 in year 3 and $453,128 in year 4. Rasberry Appraisal Report at 31. Mr. Jones assigns a retail price value to each lot which aggregates to $1,925,000 for all 8 lots. He does not apply any percentage escalation to that figure.

After completion of his report, Mr. Rasberry produced two updated exhibits, both of which were admitted into evidence. Exhibit 8 reworks the discounted cash flow analysis using a year one and two unit value of $427,000 based, in part, upon the pending contract on Lot 4, with years 3 and 4 enjoying the 5% escalation. Exhibit 9 is identical to Exhibit 8, but takes out the entrepreneurial profit deduction.

The court is inclined to give more weight to Mr. Rasberry's determination of unit value. Although Mr. Jones cites "recent" sales for comparable properties occurring in 2007 and 2010 which indicate that reductions in price from retail list prices to actual sales price ranged from 44% to 46.6%, he reduces the retail list prices of the subject lots between 50% and 68% to arrive at his aggregate value of $1,925,000. In light of his statements that Beaufort County will follow the trend of recovery in 2010, and that there will be slow but stable growth and the subject Property should compete favorably, such reductions in value are too pessimistic. The court will adopt the original unit price valuation of Mr. Rasberry in the amount of $411,000, without the 5% escalation. In sum,

the court finds his comparables persuasive, especially in light of the pending, but not closed, contract, but finds that his escalation is too speculative.

Using Exhibit 9 as a starting point and (1) keeping unit prices at $411,000 for the four year period, (2) using a 7% marketing cost, (3) using a 3% administration cost, and (4) applying a 12% discount rate, the rounded value of the Property calculates to $2,250,000.

**D.     Effect of Confirmation**

The Confirmation Order entered in this case on December 23, 2010, provides that upon entry of this valuation order, the Property shall be transferred to Capital Bank free and clear of liens and that Capital Bank's rights against any third party, namely the guarantors of the Capital Bank loan to the debtor, shall not be affected by confirmation of this order, except that the surrender value determined in this order shall be binding on all parties.

**CONCLUSION**

For purposes of valuation and the determination of whether Capital has an unsecured claim, the court considered the highest and best use of the Property, the use which yields the highest value, and whether such disposition is reasonably available to the secured creditor. For the foregoing reasons, the inclusion of a discount for entrepreneurial profit would be inappropriate in determining the value of the Property being returned to the secured creditor. The current use constitutes its highest and best use as well as the use which will generate the most favorable return. This use is reasonably available to Capital. Although both appraisals were prepared using a bulk sale analysis and Capital indicated that it prefers such disposition of the Property, the court is under no obligation to value the Property under those terms and, accordingly, Capital's preferred disposition does not alter the value determination of the court. Capital must make the ultimate choice at its own risk,

between pursuing the sale of individual lots over the anticipated four year sell out period, or the use of a bulk sale to liquidate the Property as quickly as possible. Its choice has no bearing on § 506(a) value.

Using a conservative approach, the court values the Property at $2,250,000. As a result, Capital has a secured claim in the amount of $2,250,000 and an unsecured claim in the amount of $297,087.70.

**SO ORDERED**.

**END OF DOCUMENT**